**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

     and

*ex rel.* KEVIN J. RYAN
    9172 Chestnut Grove Road
    Frederick, Maryland 21701

           Plaintiffs,

    v.

NUVASIVE, INC.
7475 Lusk Blvd.
San Diego, CA 92121

    *Serve* Resident Agent: National Corporate Research, LTD.
          523 W 6th Street, Suite 544
          Los Angeles, CA 90014

        Defendant.

**Case No.** _____
**FILED UNDER SEAL**
Pursuant to 31 U.S.C. §3730
(False Claims Act)

---

## COMPLAINT AND JURY DEMAND

COMES NOW**,** plaintiff and *qui tam* Relator Kevin J. Ryan, by and through undersigned counsel, and brings this False Claims Act ("FCA") Complaint on behalf of the United States of America against Defendant NuVasive, Inc. for damages and civil penalties arising out of the Defendant's violations of the Federal False Claims Act, 31 U.S.C. §§3729-3733 *et seq*.

### NATURE OF THE CASE

1.     This is an action for money damages including treble damages and civil penalties on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§3729-33 (FCA), the Anti-Kickback Statute, 42 U.S.C. §1320a-7b and the Food, Drug and Cosmetic Act, 21 U.S.C. §§301-397 ("FDCA") arising from false and/or fraudulent statements, records, and

claims made or caused to be made by the Defendant NuVasive and/or its agents and employees, for its intentional off-label marketing campaign, and for sustaining a fraudulent course of conduct to obtain improper government reimbursement that should not have been made, all in violation of the FCA.

2. This *qui tam* case is brought against NuVasive for causing the submission of false claims for services, for misrepresentations to the FDA and others, for NuVasive's off-label marketing regarding numerous versions of spinal implants known generally as the NuVasive CoRoent System and more specifically as CoRoent XL implants, for off-label marketing involving NuVasive's biologic called Osteocel Plus, and for NuVasive's systemic violation of the Anti-Kickback Statute.

3. The CoRoent XL implants described herein are designed for intervertebral body fusion or partial vertebral body replacement as indicated and include devices marketed and put into interstate commerce by NuVasive including, but not limited to, the following:

- o XL Standard/Lordotic
- o XL Wide Standard/Lordotic
- o Coronal Tapered Standard/Lordotic
- o XL-F Standard/Lordotic
- o XL-F Wide
- o XL-T Standard
- o XL Keeled
- o CoRoent XL-HL (Hyper Lordotic).

4. Generally, the false statements and claims made by NuVasive regarding these devices include, but are not limited to the following:

a.) Off-Label Promotion and False Statements to Doctors.

    i) False statements and omissions by NuVasive to the Federal Drug Administration ("FDA") and others that the variations on the CoRoent XL, including, but not limited to, the XL Wide Standard/Lordotic, Coronal Tapered Standard/Lordotic, XL-F Standard/Lordotic, XL-F Wide, XL-T Standard, CoRoent XL-HL and XL

2

Keeled, did not involve significant design changes that required FDA premarket notification and approval separate from that obtained for the CoRoent XL;

ii) False statements and omissions by NuVasive in training materials, device training to doctors and promotional materials that the CoRoent XL implants are indicated for degenerative spondylolithesis beyond Grade 1, degenerative scoliosis, thoracic degenerative disc disease, thoracic disc herniation, pseudoarthrosis, neurogenic claudication and/or osteoporosis and other diseases and conditions when they are not;

iii) False statements and omissions by NuVasive in training materials, device training to doctors and promotional materials that the CoRoent XL implants are indicated for use in *more than* 2 levels of the spine when they are not; and

iv) False and intentionally misleading statements and omissions by NuVasive in training materials, device training to doctors and promotional materials that the CoRoent XL implants, when used for intervertebral body fusion of the spine, are indicated to be used with NuVasive's biologic known as Osteocel Plus (an allograft) when they are not so indicated.

b.) Kickbacks to physicians to induce the use of CoRoent XL implants paid for by Federal health care programs. NuVasive has violated the Federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, by, *inter alia*, offering and providing illegal remuneration to physicians, in the form of cash, travel, lodging, meals and entertainment, as an inducement to use CoRoent XL implants for both *off-label* and approved indications.

5.     In the course of its off-label marketing scheme, NuVasive has made false and misleading statements to treating doctors and others to the effect that CoRoent XL implants were medically accepted for the off-label uses being promoted, and therefore eligible for Medicare and other Federal health care program reimbursement.

6.     In reliance on NuVasive's false statements, treating physicians used CoRoent XL implants on their patients in off-label and non-FDA-approved uses. NuVasive thus caused physicians to present false claims for payment to Medicare and other Federal health care programs. NuVasive's false statements caused certain CoRoent XL implants to be unapproved Class II medical devices used in interstate commerce. Additionally, NuVasive's false statements led to the submission and payment of false claims by Medicare and other Federal health care

3

programs, which violated Section 3729(a)(l)(a),(b),(c) of the FCA. NuVasive intended its off-label promotion to cause the submission of false claims and to result in improper payments by Federal health care programs.

7.      NuVasive's false statements and omissions respecting the CoRoent XL implants caused the submission by others of false claims for reimbursement to Medicare, Medicaid and other Federal health benefit programs, claims that would not have been paid if those health benefit programs had been fully informed about the lack of Premarket approval or, lack of approval for indicated uses claimed by Defendant.

8.      NuVasive knew or should have known that its conduct, representations and omissions were contrary to Federal law, were without FDA approval, were off-label and were creating a dangerous medical situation for unsuspecting patients.

9.      NuVasive's material representations that the CoRoent XL implants, including, but not limited to, the XL Wide, Coronal Tapered, XL-F Wide, XL-T Standard and CoRoent XL-HL were: (1) substantially equivalent to predicate devices, or, were simply different shapes and sizes of the XL Standard to "suit the individual pathology and anatomical conditions of the patient;" (2) approved to treat scoliosis; (3) approved for use with allograft, including Osteocel Plus; (4) approved for use in more than 2 levels of the spine; (5) approved for intervertebral body fusion in areas of the spine other than the lumbar; (6) approved to treat degenerative spondylolithesis beyond the minimum Grade 1; and/or (7) indicated to treat scoliosis, thoracic degenerative disc disease, thoracic disc herniation, pseudoarthrosis, neurogenic claudication and/or osteoporosis, were known or should have been known to be false and caused the submission of false claims by doctors and hospitals who billed Federal health care programs for these non-approved devices and/or non-approved indications.

4

10.     As the direct, proximate and foreseeable result of NuVasive's false and fraudulent conduct as set forth herein, NuVasive: (a) caused physicians to submit false claims to the Medicare and other Federal health care programs seeking reimbursement for uses of CoRoent XL implants that NuVasive knew were not approved by the FDA and were off-label and therefore ineligible for Federal health care program reimbursement; and (b) used false or fraudulent statements to get Federal health care programs to reimburse millions of dollars of false and fraudulent claims submitted by these physicians.

11.     NuVasive's illegal scheme to promote the use of CoRoent XL implants for indications that were not FDA approved greatly increased CoRoent XL implants' sales to the great financial benefit of NuVasive, but caused Federal health care programs to pay millions of dollars for the use of medical devices that were not approved and were medically unsafe for non-approved uses.

12.     As a direct result of NuVasive's improper practices as detailed herein, the Federal Treasury has been damaged in a substantial amount that is yet to be determined, currently estimated at approximately $500,000,000.00.

## PARTIES

13.     Plaintiff-Relator Kevin Ryan is a resident of Frederick County, Maryland. Relator was employed by NuVasive from approximately February 2010 to May 2012 as a Spine Specialist in NuVasive's sales force. In this capacity, Relator engaged in territory management of specialized high-level device sales for specific hospitals in the Maryland spine fusion market, which included Johns Hopkins, Good Samaritan Hospital, St. Agnes Hospital, Montgomery General Hospital and Howard County Hospital. Relator specialized in the sales and marketing of orthopedic and spinal fusion surgery devices, including the CoRoent XL implants, and instructed

5

numerous spine surgeons on the use of NuVasive's spinal fusion devices and procedures. Relator completed five tiers of Nuvasvie's employee training on these devices.

14.     Defendant NuVasive, Inc., a Delaware corporation incorporated in 1997, has a principal place of business of 7475 Lusk Blvd., San Diego, CA 92121 and is a publicly-held medical device company traded on the NASDAQ that focuses on developing minimally invasive surgical products and procedures for the spine. NuVasive's reported gross sales for 2010 were $478,237,000 ($388,252,000 of which was attributed to spine surgery products and $89,985,000 of which was attributed to biologics). NuVasive reported second quarter 2012 revenue of $154.4 million, a 16.1% increase over the $133.0 million for the second quarter 2011 and a 1.8% increase over the $151.7 million reported for the first quarter 2012.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732. 31 U.S.C. §3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

16.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because it authorizes nationwide service of process and because the Defendant has at least minimum contacts with the United States. Moreover, the Defendant can be found in and transacts - or has transacted - business in Maryland and employed Maryland residents. At all times relevant, Relator was employed by NuVasive, Inc. and worked for it primarily out of his home office in Frederick County, Maryland.

## FACTS COMMON TO ALL COUNTS

### Background

### *FDA Regulation of Medical Devices*

6

17.     The FDA is an agency of the United States Government responsible for protecting the health and safety of the public by assuring, among other things, that medical devices intended for use in the treatment of humans are safe and effective for their intended uses and that the labeling of such devices bear true and accurate information.

18.     Pursuant to its statutory mandate, the FDA regulates the manufacture, labeling, and shipment in interstate commerce of medical devices.

19.     Under the federal Food, Drug and Cosmetic Act (Title 21, United States Code, §§301-397, the "FDCA"), and pursuant to Title 21, United States Code § 321(h), the term "device" includes "an. . . implant . . . or other similar or related article. . . which is . intended for use in. . . the treatment or prevention of disease of man... or intended to affect the structure or any function of the body of man. . . which does not achieve its primary intended purposes through chemical action within or on the body of man and which is not dependent upon being metabolized for the achievement of its primary intended purposes."

20.     The FDA is charged with protecting American consumers by enforcing the FDCA of 1938, the FDA Modernization Act of 1997, and related public health laws.  Under the FDCA, the FDA has responsibility for ensuring that medical devices are safe and effective before they can be marketed within the United States.  The FDA's authority to regulate medical devices arises in part from the FDCA as amended by the Medical Devices Act of 1976 ("the 1976 Amendments").  General statutory standards for determining the safety and effectiveness of devices are set forth in the FDCA, 21 U.S.C. §§360c(a)(2) and (a)(3).  These standards are implemented by regulations set forth at 21 C.F.R. §860.7.

21.     Under Federal law, medical devices are classified into Class I, II, and III. Regulatory control increases from Class I to Class III.  The device classification regulation

7

defines the regulatory requirements for a general device type. Most Class I devices are exempt from Premarket Notification 510(k); most Class II devices require Premarket Notification 510(k); and most Class III devices require Premarket Approval.

22.     To market a Class II device, manufacturers are typically required to submit a 510(k) Premarket Notification to the FDA unless the device is determined to be exempt from 510(k) requirements.

23.     In submitting a 510(k) Notification, the manufacturer must demonstrate that a device is at least as safe, and effective *(i.e.* that the device is "substantially equivalent") to a legally marketed device (21 C.F.R. 807.92(a)(3) ("predicate device")). A legally marketed device, as described in 21 C.F.R. 807.92(a)(3) is a device that was legally marketed prior to May 28, 1976; a device which has been reclassified from Class III to Class II or I by the FDA; or a device which has already been found substantially equivalent through the 510(k) process.

24.     A device is substantially equivalent if, in comparison to a legally marketed device, it: (1) has the same intended use; and (2) has the same technological characteristics as the legally marketed device OR has different technological characteristics and the manufacturer submits information to the FDA which does not raise new questions of safety or effectiveness and/or demonstrates that the device is as safe and effective as the legally marketed device.

25.     For Class II medical devices requiring Premarket Notification, until the manufacturer receives an order from the FDA declaring a device to be "substantially equivalent" to a predicate device, the manufacturer may not proceed to market the device in the United States.

26.     Premarket Notifications are governed largely by 21 CFR Part 807 Subpart E. A 510(k) must demonstrate that the device is substantially equivalent to one legally in commercial

8

distribution in the United States: (1) before May 28, 1976; or (2) to a device that has been determined by FDA to be substantially equivalent.

      27.    Under the CFR, a 510(k) is required when:

        a.)    Introducing a device into commercial distribution (marketing) for the first time after May 28, 1976;

        b.)    A **different intended use** is proposed for a device which is already in commercial distribution. 21 CFR 807 specifically requires a 510k submission for a major change or modification in intended use. **Intended use is indicated by claims made for a device in labeling or advertising. Most, if not all changes in intended use will require a 510(k)**; or

        c.)    There is a change or modification of a legally marketed device and that change could significantly affect its safety or effectiveness.

21 CFR 807.81. (emphasis supplied). A few Class II devices are expressly exempt from Premarket Notification, none of which apply here.

      28.    If the FDA makes a finding of "substantial equivalence" based on the manufacturer's Premarket Notification, the device is then "cleared" for marketing and can be marketed only for the intended use stated on the label as cleared by the FDA.

      29.    If the manufacturer intends to market the device for a new or different intended use from that cleared for the predicate device, a new 510(k) Notification is required to include supporting information to show that the manufacturer has considered what consequences and effects the new use might have on the device's safety and effectiveness.

      30.    The manufacturer of a medical device is not permitted to promote its device for any use other than the intended use on the label as cleared or approved by the FDA.

      31.    A medical device is "misbranded" if the manufacturer of the device has failed to provide the FDA with Premarket Notification of a new or non-FDA-sanctioned intended use ninety days prior to introducing the device into interstate commerce for such use.

32.     The FDCA also contains provisions on misbranding and false or misleading

labeling. According to Section 502, a device is misbranded if: its labeling is false or

misleading in any way; its label does not bear adequate directions for use, including warnings

against use in certain pathological conditions; it is dangerous to health when used in the dosage

or manner or with the frequency or duration prescribed, recommended or suggested in the

labeling.

33.     A device may be deemed "misbranded" if its label, including *all* written, printed,

or graphic matter upon any article or any of its containers or wrappers or accompanying such

article at any time while a device is held for sale after shipment or delivery for shipment in

interstate commerce, fails to reveal material facts, the consequences that may result from use, or

the existence of a difference of opinion about its appropriate use. *See, e.g.* 21 U.S.C. §§ 331(a)

and (b), 352(a), (I) and (n); 21 C.F.R. § 201.57. The term "accompanying" a product as used in

Section 502 has been interpreted by the courts to include posters, tags, pamphlets, circulars,

booklets, brochures, instruction books, etc. and "most if not all advertising" about the product.

### *CoRoent XL*

34.     Currently, the CoRoent XL implants are implantable devices made from PEEK

and titanium alloy. They are used mainly in the XLIF(R) (eXtreme lateral interbody fusion)

procedure, which is a minimally invasive spinal operation. As indicated, they can be used for

intervertebral body fusion or as partial vertebral body replacement devices.

### *CoRoent XL's Limited FDA Approval*

35.     As originally submitted to the FDA, the CoRoent XL System was only a vertebral

body replacement device. The first 510(k), K043405, approved in February 2005, provides the

following device description:

10

implantable PEEK **vertebral body replacement** device **indicated for use in the thoracic and lumbar spine** (i.e., TI to L5) to replace a diseased vertebral body resected or excised for the treatment of a collapsed, damaged, or unstable vertebral body(s) due to tumor or trauma and to achieve decompression of the spinal cord and neural tissues.

(emphasis supplied).

36.     The February 2005 510k Premarket Notification (K043405) was given Regulation Number 888.3060 by the FDA.  This refers to 21 CFR 888.3060, titled "Spinal intervertebral body fixation orthosis."

37.     Still under the trade name of NuVasive CoRoent System, the CoRoent L and XL implants were then submitted for Premarket Notification and approval to the FDA and were approved under K071795 on or about December 4, 2007.

38.     Under K071795, the CoRoent L and XL implants were given Regulation Number 888.3080, which refers to 21 CFR 888.3080, titled "Intervertebral body fusion device."  The K071795 approval states that the CoRoent System is in device Class II.

39.     Under K071795, the CoRoent L and XL implants were approved for two specific indications: (i) partial vertebral body replacement (similar to the February 2005 submission) and intervertebral body fusion (a new indicated use) as further described below.

40.     Under K071795, Defendant represented that the CoRoent L and XL implants were intended to be used as partial vertebral body replacements specifically:

- in the thoracolumbar spine (T1-L5);
- to replace a diseased or damaged vertebral body caused by tumor or fracture, to restore height of a collapsed vertebral body and to achieve decompression of spinal cord and neural tissues;
- intended to be used with approved supplemental internal fixation systems; and
- allograft and autograft material may be used at the surgeon's discretion.

11

41.     Under K071795, Defendant represented that the CoRoent L and XL implants

were also intended to be used intervertebral body fusion devices specifically:

- at either <u>one level</u> or <u>two contiguous levels</u> of the <u>lumbar spine</u> (L2-S1);
- for the treatment of degenerative disc disease ("DDD") with <u>up to Grade 1</u> spondylolisthesis;
- intended to be used with supplemental internal spinal fixation systems that are cleared by the FDA (such as approved pedicle screws); and
- intended to be used with autogenous bone graft to facilitate fusion.

42.     While only the CoRoent L and XL "platforms" are discussed in NuVasive's

510(k) submissions, K071795, NuVasive does make the following vague disclosure that they are

"available in a variety of different shapes and sizes to suit the individual pathology and

anatomical conditions of the patient."  Upon information and believe, this is a veiled reference to

the numerous variations some of which are listed in Paragraph 3 *supra.*  What is intentionally

omitted from this vague reference is that these various "shapes and sizes" are marketed with

different and varying intended uses that have not been approved by the FDA.

43.     These intended uses stated in K071795 are the only ones approved by the FDA

for the CoRoent XL implants.  Later 510(k)s for the CoRoent implants contain the same intended

uses as those found in K071795 as follows and none of them indicate an intended use to treat

scoliosis or to be used in more than 2 spinal levels:

- K100043  (June 2010) -- *CoRoent XLR Standalone System* -- a standalone system with the same intended use descriptions for intervertebral body fusion and partial vertebral body replacement as appear in K071795;

- K112561 (March 2012), *CoRoent No-Profile System* - same intended use description for intervertebral body fusion as appears in K071795; and

- K120918 (June 2012), *CoRoent Titanium System* – same intended use descriptions for intervertebral body fusion and partial vertebral body replacement as appear in K071795.

44.     In or around October 2008, the FDA approved K081611 for the CoRoent System. As to the L and XL platforms, this 510(k) contains the same intended use descriptions for intervertebral body fusion (*i.e.*, one or two levels in the lumbar, for treatment of DDD up to Grade 1) and partial vertebral body replacement as appear in K071795. However, this Premarket Notification also discusses a slight variation, the CoRoent S platform, which is intended for use in anterior cervical interbody fusion in patients with DDD at one level from C2-C3 to C7-T1. This Notification does not indicate any intention to use CoRoent to treat scoliosis or to be used in more than 2 spinal levels.

45.     The only 510(k) submitted by NuVasive that advises of a different product with a different intended use is K102547, which was approved February 7, 2011. This Premarket Notification is for the CoRoent Small Interlock System, a Class II, standalone anterior intervertebral body fusion device. Its intended use is to treat DDD at one level, in the cervical spine -- specifically from C2-T1. It is intended for use with autograft. This Premarket Notification does not indicate any intention to use CoRoent implants to treat scoliosis or to be used in more than 2 spinal levels.

46.     Osteocel Plus is a biologic (non medical device) manufactured by NuVasive. It's an allograft cellular bone matrix containing native mesenchymal stem cells which is intended to mimic the biologic performance of autograft without the morbidity associated with the autograft harvest.

47.     As intervertebral body fusion devices, the CoRoent L and XL are indicated for use with autogenous bone graft (bone from a patient) to facilitate fusion. They are not indicated to be used with allograft material, including Osteocel Plus.

## *The Spine*

48.     Twenty-six pieces of bone known as vertebrae form the spine. The vertebrae group into five regions from the top: cervical, thoracic, lumbar, sacrum and coccyx.

49.     The cervical vertebrae extend from the skull to the shoulders and aid the movement of the neck and head. There are seven cervical vertebrae, referred to as Cl through C7 from top to bottom. These are followed by twelve thoracic vertebrae, from TI at the top (at the shoulders) to T12 at the bottom (below the rib cage). These are followed by five lumbar vertebrae, LI through L5. The sacrum, or S1, and the coccyx (tailbone) follow.

## *Relevant Spinal Diseases and Conditions*

50.     The word spondylolisthesis derives from two parts - spondylo which means spine, and listhesis which means slippage. A spondylolisthesis is a forward slip of one vertebra relative to another.

51.     Spondylolisthesis is often described according to its degree of severity. One commonly used description grades spondylolisthesis, with Grade 1 being least advanced, and Grade 5 being most advanced.

52.     Degenerative disc disease (DDD) is not truly a disease, but instead a condition in which pain is caused from a damaged disc. As we age, our spinal discs degenerate, which may result in degenerative disc disease in some people. These age-related changes include the loss of fluid in discs and/or tiny tears or cracks in the outer layer (annulus or capsule) of the discs.

53.     Scoliosis is an abnormal curving of the spine. There are many types and causes of scoliosis, including: (1) congenital scoliosis, caused by a bone abnormality present at birth; (2) neuromuscular scoliosis, a result of abnormal muscles or nerves; (3) degenerative scoliosis, normally resulting from traumatic (from an injury or illness) bone collapse, previous major back

14

surgery, or osteoporosis (thinning of the bones); and (4) idiopathic scoliosis, the most common

type, which has no specific identifiable cause.

54.     Those with scoliosis (spinal curves) beyond 40 degrees to 50 degrees are often

considered for spinal surgery.

### *False Claims Act*

55.     The False Claims Act provides, in pertinent part, that any person who:

(a)(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(a)(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . .

is liable to the United States Government for any civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

56.     For purposes of the False Claims Act,

the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (1986).

57.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to

$11,000 for violations occurring on or after September 29, 1999.

### The Medicare Program

58.     Medicare is the federal health insurance program that was created in 1965 when Title XVII of the Social Security Act was adopted. 42 U.S.C. §§ 1395, *et seq*. Medicare covers people age 65 and older regardless of their income or medical history, and coverage extends to about 46 million Americans.

59.     Medicare is organized into four parts. Part A pays for inpatient hospital stays, skilled nursing facility stays, home health visits (also under Part B), and hospice care.  Part B covers physician visits, outpatient services, preventive services, and home health visits.  Part C , the Medicare Advantage program, allows beneficiaries to enroll in a private health, such as a health maintenance organization (HMO), and receive all Medicare-covered benefits. Part D is the voluntary, subsidized outpatient prescription drug benefit.

60.     The Centers for Medicare and Medicaid Services (CMS) administers Medicare. However, most of the daily administration and operation of the Medicare program is managed through contracts with private insurance companies that operate as Fiscal Intermediaries.  Fiscal Intermediaries accept and pay reimbursement claims under Medicare Part A and some claims under Part B.  Acceptance and payment of claims under Medicare Part B are completed through "Medicare Carriers."

61.     CMS uses the FDA categorization of a device as a factor in making Medicare coverage decisions. 42 C.F.R. §405.201.

62.     Medicare may reimburse for Class II devices if they are approved by the FDA pursuant to the Premarket Notification process.

63.     Under Medicare regulations, Medicare will not reimburse providers or institutions or "medical and hospital services that are related to the use of a device that is not covered

16

because CMS determines the device is not "reasonable" and "necessary" under section I 862(a)(l)(A) of the Act or because it is excluded from coverage for other reasons. Services that are excluded from coverage include all services furnished in preparation for the use of a noncovered device, services furnished contemporaneously with and necessary to the use of a noncovered device, and services furnished as necessary after-care that are incident to recovery from the use of the device or from related noncovered services.

### *The Anti-Kickback Statute*

64.     The Anti-kickback Statute ("AKS") prohibits any person or entity (including physicians or hospitals) from "knowingly and willfully" soliciting, receiving, offering or paying "any remuneration, indirectly, overtly or covertly, in cash or in kind" in return for "referring an individual to a person for the furnishing of any item to or service for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. §1320a-7b(b)(l) & (2). This includes intent to induce referrals or business orders, including the utilization of medical devices paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. §1001.952(f).

65.     The definition of "federal health care program" for purposes of the AKS includes Medicare, Medicaid and Tricare. This provision makes it unlawful for a physician to make a referral that will lead to a claim being submitted to Medicare for services or products supplied by an entity (such as a medical device company) with which the physician has a financial relationship, unless the relationship is not intended to induce referrals and is exempt under a statutory or regulatory safe harbor.

66.     The AKS was passed because of Congressional concerns that payoffs to

17

those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, or even harmful, to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms Congress enacted a prohibition against the offer or payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality care.

67.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statue to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. §1320a-7a(a).

68.     Such remunerations are kickbacks when paid to induce or reward physicians' utilization of medical devices. Kickbacks increase Government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs, medical devices and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may use a medical device based on the physician's own financial interests rather than according to the patient's medical needs or safety.

69.     The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. §1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protects NuVasive's conduct in this case.

70.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. §1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be

enforced under the False Claims Act. PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."

71. As detailed herein, NuVasive's off-label marketing and promotion of CoRoent XL implants and Osteocel Plus repeatedly violated provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act, because NuVasive's improper kickbacks and incentives induced physicians to choose and utilize CoRoent XL implants for non-approved, non-indicated uses when they otherwise would not have. Many of those procedures utilizing CoRoent XL implants were paid for by Medicare and other Government-funded health insurance programs.

72. It is a violation of the False Claims Act to knowingly pay kickbacks to physicians to induce them to utilize a medical device off-label and to seek reimbursement for a medical device from a Federal Government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while causing another to so certify), or billing the Government as if in compliance with these laws.

### Specific Allegations

*False Statements to the FDA*

73. Under K071795, NuVasive represented that the CoRoent L and XL implants were intended to be used as partial vertebral body replacements specifically:

- In the thoracolumbar spine (T1-L5);
- to replace a diseased or damaged vertebral body caused by tumor or fracture, to restore height of a collapsed vertebral body and to achieve decompression of spinal cord and neural tissues; and

19

- intended to be used with approved supplemental internal fixation systems. Allograft and autograft material may be used at the surgeon's discretion.

74. Under K071795, NuVasive represented that the CoRoent L and XL implants were also intended to be used intervertebral body fusion devices specifically:

- at either <u>one</u> level or <u>two contiguous levels</u> of the <u>lumbar spine</u> (L2-S1);
- for the treatment of degenerative disc disease with <u>up to Grade 1 spondylolisthesis;</u>
- intended to be used with supplemental internal spinal fixation systems that are cleared by the FDA (such as approved pedicle screws); and
- intended to be used with autogenous bone graft (bone from a patient) to facilitate fusion.

75. These intended uses were and remain *the only ones* approved by the FDA for the CoRoent XL implants.

76. The CoRoent L and XL implants are not approved to treat scoliosis.

77. The CoRoent L and XL implants are not approved to be used in more than 2 spinal levels.

78. The CoRoent L and XL implants are not approved to be used in patients with degenerative disc disease beyond Grade 1 spondylolisthesis.

79. As an intervertebral body fusion device, the CoRoent XL is not to be used in any other area of the spine except for the lumbar region.

80. Osteocel Plus is a biologic (non medical device) manufactured by NuVasive. It's an allograft cellular bone matrix containing native mesenchymal stem cells which is intended to mimic the biologic performance of autograft without the morbidity associated with the autograft harvest.

81. As intervertebral body fusion devices, the CoRoent L and XL are not indicated to be used with allograft material, including Osteocel Plus. Instead, they are only approved for use

20

with supplemental internal spinal fixation systems that are cleared by the FDA (*i.e.* approved pedicle screws) or with autogenous bone graft (bone from a patient).

82.     Defendant did not file separate, or distinct, 510(k)s for any of the variety of CoRoent XL implants it markets, including XL Wide Standard, Coronal Tapered Standard, XL-F Standard, XL-F Wide, XL-T Standard, XL-HL or the XL Keeled, and/or other similar devices marketed under other CoRoent XL trade names.

83.     According to the FDA's 510(k) acceptance and approval letter to NuVasive, the company was allowed, and only allowed, to "begin marketing your device as described in your Section 510(k) premarket notification."

84.     While only the CoRoent L and XL "platforms" are discussed in K071795, NuVasive does make the following vague disclosure that they are "available in a variety of different shapes and sizes to suit the individual pathology and anatomical conditions of the patient." Upon information and believe, this is a veiled reference to the numerous variations some of which are listed in Paragraph 3 *supra. The disclosure is, however, completely devoid of any mention of uses for any other indications other than those explicitly stated and so limited by the 510(k).*

85.     In its Form 10-K submissions to the United States Securities and Exchange Commission and in other public representations, NuVasive claims, in general, that it does not need new 510(k) approvals device enhancements and modifications. It has said:

> After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use, will require a new 510(k) clearance or could require premarket approval. The FDA requires each manufacturer to make this determination initially, but the FDA can review any such decision and can disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or

21

recall the modified device until 510(k) clearance or premarket approval is obtained. If the FDA requires us to seek 510(k) clearance or premarket approval for any modifications to a previously cleared product, we may be required to cease marketing or recall the modified device until we obtain this clearance or approval. Also, in these circumstances, we may be subject to significant regulatory fines or penalties. **We have made and plan to continue to make additional product enhancements that we believe do not require new 510(k) clearances.**

86.     If a manufacturer intends to market the device for a new or different indication from that cleared for the predicate device, a new 510(k) Notification is required to include supporting information to show that the manufacturer has considered what consequences and effects the new use might have on the device's safety and effectiveness.

87.     NuVasive has not filed new 510(k)s and has not received any FDA approvals for any intended uses for CoRoent XL other than listed in the #K071795 Notification. Nonetheless, NuVasive has been and continues to market CoRoent XL implants for other uses, including for more than 2 spinal levels, more than lumbar use, to treat degenerative spondylolisthesis, and to treat scoliosis and other conditions or diseases, as further detailed.

88.     NuVasive intentionally misrepresented to the FDA that its CoRoent XL implants would only be marketed for the intended uses in the Premarket Notification. Upon information and belief, NuVasive intended all along to market CoRoent XL for more than 2 spinal levels and to treat more than DDD, including such conditions as scoliosis.

89.     NuVasive intentionally omitted material facts to the FDA when it failed to advise that the CoRoent XL "platforms" included new, changed or enhanced devices that were not approved by the FDA and that significantly affect their safety or effectiveness

22

90.     NuVasive intentionally omitted material facts to the FDA when it failed to file

new 510(k)s for CoRoent XL devices that are promoted with different intended uses than those

approved by the FDA.

*Off-Label Marketing*

A. *Off-label marketing for the treatment of non-approved conditions and diseases.*

91.     In a calculated, knowing and intentional scheme to market CoRoent XL implants

for non-approved, off-label uses nationwide, NuVasive has trained its national sales force to

market and sell CoRoent XL for both approved and off-label uses.

92.     For example, NuVasive has made countless false statements and omissions in

training materials, device training to doctors and promotional materials that the CoRoent XL

implants are indicated for degenerative spondylolithesis beyond Grade 1, scoliosis, adjacent level

disease, thoracic degenerative disc disease, thoracic disc herniation, pseudarthrosis, neurogenic

claudication and/or osteoporosis when they are not.

93.     In another example, NuVasive published a marketing brochure in 2008 titled

"CoRoent XL," which it continues to use to this day to market and sell its CoRoent XL products

to physicians nationwide, and which contains an "Implant Recommendation Chart for Specific

Conditions." It states that the CoRoent XL Standard and XL Lordotic are recommended to be

used to treat degenerative spondylolisthesis. It omits any reference to being limited to only the

least severe, Grade 1, condition. This is off-label marketing.

94.     The same brochure contains the following misrepresentation and off-label

marketing statement about CoRoent XL's indications:

> From degenerative disc disease *to idiopathic scoliosis and beyond*, the NuVasive
> CoRoent XL portfolio provides a customized implant for every requirement. *No*

*matter what the pathology*. CoRoent XL has a unique and innovative solution to all your lateral surgical needs.

(emphasis supplied). As detailed *supra,* the CoRoent XL is not approved for scoliosis or all other pathologies as stated in this brochure. This constitutes off-label marketing.

95. The same brochure contains the following quote from Dr. William Smith:

From single-level degenerative disc disease to revision surgery, **scoliosis, thoracic disc herniation, and more,** the comprehensive CoRoent XL line of implants allowed me to treat an incredible range of often previously untreatable patient indications.

(emphasis supplied). As detailed *supra,* the CoRoent XL is not approved for scoliosis or thoracic disc herniation. The inclusion of this statement constitutes off-label marketing.

96. NuVasive published a marketing brochure in 2009, which it continues to use to this day to market and sell its CoRoent XL products to physicians nationwide titled "extreme Lateral Implants." This 2009 brochure also contains an "Implant Recommendation Chart for Specific Conditions." It states that the CoRoent XL Standard, XL Lordotic and XL-K are recommended to be used to treat degenerative spondylolisthesis without reference to being limited to Grade 1. This constitutes off-label marketing.

97. This 2009 brochure also states in the "Implant Recommendation Chart for Specific Conditions" that the CoRoent XL, XL-W and XL-CT are recommended to treat degenerative scoliosis. It is not approved to treat scoliosis. This is off-label marketing.

98. In another example, one of NuVasive's new CoRoent XL products is the CoRoent XL-HL (Hyper lordotic). It is designed to possibly eliminate the use of PSO's (pedical subtraction osteomies) by providing hyper lordisis through the XLIF procedure from the implant itself instead of the posterior osteomies. The XL-HL is marketed by the NuVasive sales force as intended to be used in multi-level cases, and indeed, it is used in multi-level cases frequently

24

based on the misrepresentations of NuVasive's sales force.  Moreover, *this implant is specifically designed to be used to treat scoliosis.*  NuVasive did not request or receive Premarket Notification for this new device, and it was never approved for multi-level use or to treat scoliosis.

99.     Further, NuVasive hands out a one-page document to its sales force to be used in promotion which shows Fleuro Pictures of the CoRoent XL implant being used for interbody fusion and which contains the following bullet-point chart of indicated uses:

"CoRoent Indication Specific Implants"
- XL Standard
     Indications: Degenerative Disc Disease,
     Degenerative Spondylolithesis
- XL Wide Standard/Lordotic
     Indications: Degenerative Disc Disease, Degenerative Scoliosis,
     Large Patients, Patients with Osteoporosis, Revision Surgery
- Coronal Tapered Standard/Lordotic
     Indications: Degenerative Disc Disease, Degenerative Scoliosis,
     Degenerative Spondylolithesis, Adjacent-Level Disease
- XL-F Standard/Lordotic
     Indications: Degenerative Disc Disease, Revision Surgery
- XL-F Wide
     Indications: Degenerative Disc Disease, Degenerative Scoliosis,
     Large Patients, Patients with Osteoporosis, Revision Surgery
- XL-T Standard
     Indications: Thoracic degenerative disc disease,
     thoracic disc herniation
- XL Keeled
     Indications: Degenerative Disc Disease, Degenerative
     Spondylolithesis, Revision Surgery

100.    Contrary to this promotional and sales staff training material published and disseminated by NuVasive, the CoRoent XL implant is *not* indicated for Degenerative Spondylolithesis, Scoliosis, Revision Surgery, the Thoracic Spine or Adjacent-Level Disease. Any and all such marketing is off-label.

25

101. NuVasive trains its nationwide sales staff to promote, market and sell the CoRoent XL line of implants to be used to treat far more than degenerative disc disease with up to Grade 1 spondylolisthesis as contained in the #K071795. Sales staff is trained to, and routinely does, market and promote CoRoent XL for non-approved conditions and diseases, including but not limited to: scoliosis, severe spondylolisthesis (greater than Grade 1), adjacent level disease, osteoporosis, obese patients, revision surgery, thoracic degenerative disc disease, pseudoarthrosis, neurogenic claudication and thoracic disc herniation.

102. NuVasive regularly and continuously puts on physician trainings, including practice on cadavers, that demonstrate how to use CoRoent XL implants to treat non-approved conditions and diseases including but not limited to: scoliosis, severe spondylolisthesis (greater than Grade 1), adjacent level disease, osteoporosis, obese patients, revision surgery, thoracic degenerative disc disease, pseudoarthrosis, neurogenic claudication and thoracic disc herniation.

B. *Off-label marketing of use in more than 2 levels*

103. NuVasive has made countless false statements and omissions in training materials, device training to doctors and promotional materials that the CoRoent XL implants are indicated for use in *more than* 2 levels of the spine when they are not.

104. For example, NuVasive published a marketing brochure in 2008 titled "CoRoent XL," which it continues to use to this day to market and sell its CoRoent products to physicians nationwide. This brochure shows a "before" and "after" x-ray of lumbar spine with CoRoent XL implants in 3 contiguous levels. The CoRoent implants are only approved for up to 2 contiguous levels. This constitutes off-label marketing.

105. In another example, NuVasive published a marketing brochure in 2009, which it continues to use to this day to market and sell its CoRoent XL products to physicians nationwide

titled "extreme Lateral Implants." This brochure shows a "before" and "after" x-ray of lumbar spine with CoRoent XL implants in 3 contiguous levels. The CoRoent XL implants are only approved for up to 2 contiguous levels. This constitutes off-label marketing.

106.    NuVasive hands out a one-page document to its nationwide sales force to be used in marketing and promotion which shows two Fleuro Pictures of the CoRoent XL implant being used for interbody fusion in 3 spinal levels.

107.    NuVasive trains its nationwide sales staff to promote, market and sell the CoRoent XL to physicians to be used as an intervertebral body fusion device in more than 2 contiguous levels of the lumbar spine. Sales staff is trained to, and routinely do, market and promote the CoRoent XL line of products for 3, 4 and 5 spinal levels. This constitutes off-label marketing.

108.    Furthermore, NuVasive is aware of the fact that there have been medical complications with these multiple level uses including, but not limited to: vertebral body fractures (cracks), psoas injury, nerve injury, vascular injury and cauda equina injury. As such, using CoRoent XL off-label in more than 2 levels has created a medical risk and safety issues for patients, which, upon information and belief, have not been reported to the FDA.

109.    NuVasive regularly and continuously puts on physician trainings, including practice on cadavers, that demonstrate how to use CoRoent XL implants in 3, 4 and 5 spinal levels. This training and promotion constitutes off-label marketing.

C.      *Off-label marketing for use with Osteocel Plus*

110.    NuVasive has made countless false statements and omissions in training materials, device training to doctors and promotional materials that the CoRoent XL implants, when used for intervertebral body fusion of the spine, are indicated to be used with NuVasive's

27

biologic known as Osteocel Plus (an allograft), when it is not. As intervertebral body fusion devices of the spine, they are only indicated to be used with "supplemental internal spinal fixation systems that are cleared by the FDA (such as approved pedicle screws)" or with "autogenous bone graft" (bone from a patient) according to K071795. Osteocel Plus is not a supplemental internal spinal fixation system and it is not autogenous bone graft.

111. The standard off-label marketing method used by NuVasive regarding Osteocel Plus in written marketing materials is to show a picture or x-ray of the CoRoent XL filled with Osteocel Plus allograft, and then to footnote in small print a disclaimer that states that the CoRoent XL is not approved to be used as shown in the picture or x-ray.

112. For example, in NuVasive's 2009 published marketing brochure titled "Osteocel Plus The Complete Fusion Solution," there is a section called "Surgical Applications" with renderings of surgical technique and implant placement. It shows and labels the CoRoent XL implant with Osteocel Plus filled in as a fusion fixation device. The entire rendering contains a footnote in small font that says in its entirety:

> Note: FDA PEEK-OPTIMA Implant Clearances: All PEEK-OPTIMA interbody implants are cleared for use only with autograft, including the CoRoent family of implants. CoRoent thoracic and lumbar PEEK-OPTIMA implants are cleared as partial vertebral body replacements for use with allograft or autograft.

113. This type of demonstration followed by a small disclaimer (that the implant and biologic are not intended to be used as demonstrated) is used by NuVasive in many of its marketing and promotional materials and constitutes off label marketing.

114. NuVasive is very aware in general of the prohibition against off-label marketing. In its 2011 10-K filing with the SEC, it stated in part, "pursuant to FDA regulations, we can only market our products for cleared or approved uses. Although physicians are permitted to use

medical devices for indications other than those cleared or approved by the FDA based on their medical judgment, we are prohibited from promoting products for such off-label uses."

115.    NuVasive's express objective is to obsolete its own products by the rapid market introduction of new products, and in doing so it is keenly aware of the slow-moving regulatory system, which, if followed properly, would slow down NuVasive's ability to constantly change its products and to obsolete itself. In its 2011 10-K submission, it stated, "[w]e have the objective of staying ahead of the spine market by obsoleting our own products with new products and enhancements. … Additionally, in our quest to obsolete our own products, we must effectively manage our inventory, the demand for new and current products and the regulatory process for new products in order to avoid unintended adverse financial and accounting consequences."

### *NuVasive Caused Providers to Provide False Claims to Federal Health Care Programs*

116.    NuVasive has been wildly successful in intentionally promoting its CoRoent XL implants for numerous non-approved, off-label uses, including, but not limited to, multiple spinal levels and to treat diseases like scoliosis so as to cause physicians and hospitals to bill and receive Federal reimbursement for procedures that used CoRoent XL implants for non-approved, off-label uses.

117.    For example, Dr. Paul MacAfee, after having received off-label marketing, promotion and training from NuVasive sales force, performed a spinal operation on a  patient on or about 10/22/10. The operation was to treat the patient's degenerative scoliosis. He performed spinal fusion using CoRoent XL implants on *four levels* (L1-5). Upon information and belief, this patient was a Medicare beneficiary and the Federal government was billed for and paid for this surgery. NuVasive's Director of Marketing sent this out as a case study to all nationwide

29

NuVasive sales force as a model to be used in marketing and promotion of CoRoent XL implants (a "Case of the Week") and to induce more physicians to purchase, use, bill for and receive Federal reimbursement for using CoRoent XL implants off-label.

118. In another example, Doctors Matt & Josh Ammerman of Washington, D.C., after having received off-label marketing, promotion and training from NuVasive sales force, performed spinal fusion surgery on a 70-year-old female patient with degenerative scoliosis on or about 11/03/2010. They used the CoRoent XL-Wide implant on *three levels* (L2-5). Upon information and belief, this patient was a Medicare beneficiary and the Federal government was billed for and paid for this surgery. NuVasive's Director of Market Development Teams, Peter Marzano, sent out this case as a "Case of the Week" to all NuVasive sales people to use in marketing and promotion to physicians nationwide and to induce further off-label use and associated Federal reimbursement by other physicians.

119. In another example, Dr. William Hunter from Gastonia, NC, after having received off-label marketing, promotion and training from NuVasive sales force, performed XLIF surgery on a 65-year-old female patient on or about 9/9/10. Among this patient's diagnoses were degenerative disc disease and degenerative scoliosis. Upon information and belief, this patient was a Medicare beneficiary and the Federal government was billed for and paid for this surgery. This case was circulated by Ron Johnson, XLIF Market Development Manger, Atlantic to all NuVasive sales force nationwide as an example of using CoRoent XL implants to treat severe degenerative disc disease and scoliosis and for use by the sales force in marketing and promotion of CoRoent XL implants for off-label uses and to induce more off-label use and billing.

120. In another example, Doctor James Kang of Pittsburgh, PA, after having received off-label marketing, promotion and training from NuVasive sales force, performed XLIF surgery

on a 74-year-old male patient on or about 8/9/11. The patient was diagnosed with Pseudoarthrosis at L1-2. As a result of his previous off-label training and marketing, Dr. Kang used the CoRoent XL implants for this surgery. Upon information and belief, this patient was a Medicare beneficiary and the Federal government was billed for and paid for this surgery. This case was circulated by JJ Grandusky, XLIF Market Development Manger, Northeast to all NuVasive sales force nationwide as a Case of the Week and as an example of using CoRoent XL implants to treat Pseudoarthrosis (a non-approved use) and for use by the sales force in marketing and promotion of CoRoent XL implants for off-label uses.

121.    In another example, Doctor Michael Shapiro from Long Island, NY performed a TLIF operation on a 58-year old female patient on or about 2/2/11. She was diagnosed with Neurogenic Claudication and the surgery was performed in her Thoracic spine (T 6-7) using CoRoent XL-T implants. CoRoent XL implants are not approved for use in the thoracic spine for intervertebral body fusion. The case was circulated nationwide by NuVasive to its sales force after it was submitted by NuVasive Spine Specialist Dean D'Agnostino. The study was a Case of the Week for all NuVasive salespeople to use in nationwide marketing and promotion of CoRoent XL implants for off-label uses, including in the thoracic spine and to treat Neurogenic Claudication, both non-approved uses.

122.    The cost billed to payors, including Federal health care programs, vary depending on market and geography, but, generally, one CoRoent XL implant was billed at approximately $11,000 and it increased by at least $7,500 per level for the basic implant. This basic charge does not include any fixation or Osteocel. Therefore, NuVasive makes more money the more spinal levels in which physicians use the devices. A 2-level operation translates into significantly more money for NuVasive than a 1-level procedure and a 3-level operation, of

course, yields even more. NuVasive intentionally markets CoRoent XL implants off-label to induce physicians to use them for more than 2 levels so NuVasive can receive more revenue.

*Anti-kickback Violations*

123.    Upon information and belief, as part of its comprehensive effort to promote the off-label use of CoRoent XL implants, NuVasive has had its employees ghostwrite and edit articles and abstracts which are then submitted to professional journals under the names of practicing physicians (who are heavy CoRoent XL implant users and who are paid by NuVasive to lend their names to these articles).

124.    NuVasive also compensates physicians to submit scholarly articles touting the off-label uses of CoRoent XL implants. For example, Dr. Luiz Pimento and Dr. Juan Uribe were compensated by NuVasive to publish XLIF papers and to make peer presentations on "expanded indications" including off-label, non-approved uses for CoRoent XL implants. One such peer presentation took place on 3/9/11.

125.    NuVasive uses newsletters and websites, which may facially appear to be maintained by third parties, but which are wholly funded and controlled by NuVasive, to promote the off-label use of CoRoent XL implants. This includes SOLAS, the Society of Lateral Access Surgery, which claims to be "dedicated to the advancement of minimally disruptive spine surgery techniques through peer-to-peer communication, research, and clinical education efforts."

126.    SOLAS has a public website (http://www.lateralaccess.org/) and puts out periodic newsletters to physicians across the *country*. Physicians can join SOLAS online for a $250 membership fee which includes

> • Customized print-on-demand practice enhancement/patient education program

32

- Research opportunities
- Surgeon education program
- Physician locator
- Invitation to annual meeting
- Access to online services – Resource Library, Presentations, and Illustrations

127.    Physicians become eligible to join SOLAS as a full member after having accomplished 10 XLIF cases, upon information and belief, using NuVasive products and devices.

128.    According to its website, SOLAS "was created by and is supported with funding from NuVasive®, Inc" and "[a]ll of NuVasive's Maximum Access Surgery (MAS®) training is conducted under the umbrella of SOLAS." (https://www.lateralaccess.org/about/ accessed on 8/17/12).

129.    The SOLAS News (membership newsletter) is published by and, upon information and belief, ghost written in large part by NuVasive.

130.    Some of the issues of the SOLAS News, published by NuVasive and disseminated to physicians nationwide, contain off-label marketing of CoRoent XL implants. For example, Issue 7/April 2009 SOLAS News contained the following off-label marketing:

> CoRoent XL-CT: Tapered 4 degrees in the coronal plane, these new implants allow for increased correction of *scoliosis*, especially when the inferior vertebral body is trapezoidal. Parallel and lordotic options are available.

(emphasis supplied).  The CoRoent XL implants are not indicated for scoliosis.

131.    The SOLAS News has bylines for Luiz Pimenta, MD, PhD (SOLAS Executive Chairman) and G. Bryan Cornwall, PhD, PEng (SOLAS Executive Managing Director).  Dr. Pimenta is a practicing physician who is a frequent user of CoRoent XL implants and who is compensated by NuVasive to have his name prominently displayed on the SOLAS News issues. Dr. Cornwall works for NuVasive.

33

132. NuVasive also frequently compensated physicians to attend NuVasive trainings, usually either in San Diego, CA or in New Jersey. The only requirement by NuVasive was that the surgeon have experience using NuVasive's medical devices and products and profess an interest in using more in the future. Upon request from a NuVasive sales representative, NuVasive would pay for the physician's flight to and from the training, all meals while at the training, rental car and entertainment, including such items as golf. This compensation violated the Anti-Kickback Statute.

133. An example of surgeon training is the Marquis Visit Program, called "MVP" by NuVasive. This training includes hands-on cadaver training with CoRoent XL implants. It is at these trainings where NuVasive sales people and paid physicians train other physicians on off-label use of CoRoent XL implants, including, but not limited to, for fusion in more than 2 levels and to treat adjacent disease, scoliosis and many other non-indicated diseases and conditions.

134. The MVP program also includes peer-to-peer events where a proctor surgeon presents surgical techniques using CoRoent XL implants off-label and other NuVasive devices and products and is paid to do so by NuVasive. These events occur "over a meal," which is wholly paid for by NuVasive.

135. NuVasive knew that each Medicare and Medicaid provider is required to enter into a provider agreement with the government (CMS Form 855 A, 855B, or 8551), and that under the terms of that agreement each Medicare or Medicaid provider certifies that it will comply with all laws and regulations concerning proper practices for those providers. One of the laws included in this certification is the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(B).

136. A Medicare or Medicaid provider's compliance with the provider agreement is a condition for receipt of payments under the Medicare or Medicaid program.

34

137.    Physicians who receive payments in violation of the Anti-Kickback Statute violate their certifications and are disqualified from receiving payment as part of the Medicare or Medicaid programs.

138.    As a result of NuVasive's payments to physicians in violation of the Anti-Kickback Statute, and their receipt of those payments, the physicians became ineligible to receive payment under the Medicare or Medicaid programs.

139.    NuVasive knew and intended that providers who were ineligible under the Medicare and Medicaid programs (as a result of NuVasive's payments to them, and their receipt of those payments, in violation of the Anti-Kickback Statute) would submit claims for payment to the Medicare and Medicaid programs for the purchase of and surgical use of CoRoent XL implants. These claims by these physicians were false and NuVasive caused their submission.

## COUNT I
## FALSE CLAIMS ACT
(Violation of 31 U.S.C. §3729(a)(1)(A))

140.    Relator realleges, adopts and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

141.    With respect to the patients in whom the CoRoent XL implants were implanted in more than 2 levels, in other than the lumbar spine, or to treat non-approved diagnoses, NuVasive knew or should have known [as defined in 31 U.S.C. §3801(a)(5)] that it made, presented, or submitted, or caused to be made or presented, false or fraudulent claims for payment by Medicare Part A and B, Medicaid, and other Federal health care programs.

142.    Also, by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the federally funded Medicare Program and other Federal and State health care programs,

false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

143. NuVasive intended for these claims to be paid by the Federal health care programs.

144. Each of the claims submitted by or caused to be submitted by NuVasive for each procedure done on each patient is a separate false and fraudulent claim.

145. NuVasive presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

146. Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. §3729(a)(I).

147. In summary, by virtue of the acts described above, NuVasive knowingly caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. §3729(a)(1)(a).

148. As a result of these false or fraudulent claims submitted or caused to be submitted by NuVasive, the United States Treasury, through Medicare, Medicaid and other Federal health care programs paid these claims, resulting in damage to the United States, in the amount to be determined at trial.

### COUNT II
### FALSE CLAIMS ACT
(Violation of 31 U.S.C. §3729(a)(1)(b))

149. Relator realleges, adopts and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

150. For purposes of obtaining or aiding to obtain payment or approval of Medicare, Medicaid, or other Federal health care programs reimbursement claims, NuVasive made or

presented or caused to be made or presented to the United States false or fraudulent records, knowing these records to be false or fraudulent or acting with reckless disregard or deliberate ignorance thereof.

151.    Also, by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the federally funded Medicare Program and other Federal and State health care programs, false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement.

152.    The United States, through its carriers or intermediaries, was unaware of the foregoing circumstances and conduct of NuVasive and in reliance on said false and fraudulent records authorized payments to be made, which enriched NuVasive, and which damaged the United States Government.

153.    Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. §3729(a)(2).

154.    In summary, by virtue of the acts described above, NuVasive knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(b).

155.    As a result of these false or fraudulent claims submitted or caused to be submitted by NuVasive, the United States paid the claims, resulting in damages to the United States, in an amount to be determined at trial.

## COUNT III
### False Claim Act
(31 U.S.C. §3729(a)(1)(C))

156.    Relator realleges, adopts and incorporates by reference all allegations in the Complaint as if specifically reiterated herein.

157.    The Anti-Kickback Statute, 42 U.S.C. §1320a-7b, prohibits any person from knowingly and willfully offering or paying any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, order, arrange for, or recommend purchasing or ordering any good, service, or item for which payment may be made (in whole or in part) under a Federal health care program.

158.    NuVasive has knowingly and willfully offered and paid remuneration directly to physicians to induce those physicians to purchase, order, or arrange for the purchasing or ordering of CoRoent XL implants and Osteocel Plus where payment would be made (in whole or in part) under a Federal health care program.

159.    NuVasive knew that each Medicare and Medicaid provider is required to enter into a provider agreement with the government (CMS Form 855 A, 855B, or 8551), and that under the terms of that agreement each Medicare or Medicaid provider certifies that it will comply with all laws and regulations concerning proper practices for those providers.  One of the laws included in this certification is the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(B).

160.    A Medicare or Medicaid provider's compliance with the provider agreement is a condition for receipt of payments under the Medicare or Medicaid program.

161. Physicians who receive payments in violation of the Anti-Kickback Statute violate their certifications and are disqualified from receiving payment as part of the Medicare or Medicaid programs.

162. As a result of NuVasive's payments to physicians in violation of the Anti-Kickback Statute, and their receipt of those payments, the physicians became ineligible to receive payment under the Medicare or Medicaid programs.

163. NuVasive knew and intended that providers who were ineligible under the Medicare and Medicaid programs (as a result of NuVasive's payments to them, and their receipt of those payments, in violation of the Anti-Kickback Statute) would submit claims for payment to the Medicare and Medicaid programs for the purchase and use of CoRoent XL implants and Osteocel Plus. These claims by these physicians were false and NuVasive caused their submission.

164. As set forth in the preceding paragraphs, NuVasive conspired with private physicians, other health care providers, and other third-party interests who assisted Defendant in its illegal *off-label* marketing campaign to defraud the United States by getting false and/or fraudulent Medicare and Medicaid claims paid in violation of 31 U.S.C. §3729(a)(1)(C).

165. NuVasive, by and through its officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

166. As a result of NuVasive's acts, the United States Government reimbursed physicians for medical devices that it otherwise would not have had NuVasive not presented false or misleading information to the physicians in an effort to promote *off-label* and medically unnecessary use of CoRoent XL implants and Osteocel Plus.

167. Each medical device that was used as a result of Defendant's illegal marketing practices and/or illegal inducements represents a false or fraudulent record or statement. Each claim for reimbursement for such *off-label* or illegally induced medical device submitted to a federal health insurance program represents a false or fraudulent claim for payment.

168. By reason of NuVasive's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Federal health insurance programs have paid numerous claims for *off-label* medical devices for indications that were not approved by the FDA, not reasonable and necessary to diagnose or treat patients, not medically necessary, and/or otherwise induced and caused by NuVasive's massive fraud. These use and purchase of these medical devices and the corresponding claims to federally-funded health care programs were a foreseeable and intended result of NuVasive's illegal acts.

### PRAYER FOR RELIEF

WHEREFORE, Relator prays, on behalf of the United States and himself that, on final trial of this case, judgment be entered in favor the United States and against Defendant as follows:

A. On the First Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

B. On the Second Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs;

40

C.     On the Third Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law, including, but not limited to, statutory penalties for each violation, attorney's fees and costs; and

D.     For the costs or this action, prejudgment interest, interest on the judgment and for any other and further relief to which Plaintiff, the United States, and Relator may be justly entitled.

## JURY DEMAND

Relator hereby demands a jury trial as to all issues so triable.

Veronica Byam Nannis

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

Veronica Nannis (Fed. Bar No. 15679)
vnannis@jgllaw.com
Jay P. Holland (Fed. Bar No. 422258)
jholland@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
*Attorneys for Plaintiff/Relator Kevin Ryan*